80 F.3d 1006
 64 USLW 2639, 108 Ed. Law Rep. 502
 Debra ROWINSKY, for Herself and as Next Friend of "Jane Doe"
and "Janet Doe," Her Minor Children, and for All
Those Similarly Situated, Plaintiff-Appellant,
v.
BRYAN INDEPENDENT SCHOOL DISTRICT, et al., Defendants-Appellees.
 No. 95-20049.
 United States Court of Appeals,
Fifth Circuit.
 April 2, 1996.
 
 James C. Harrington, Saul Gonzalez, Maryann Overath, Texas Civil Rights Project, Austin, TX, for plaintiff-appellant.
 Jennifer Weston Jacobs, Lisa A. Brown, Bracewell & Patterson, Houston, TX, for defendants-appellees.
 Marcia Devins Greenberger, Deborah L. Brake, National Women's Law Center, Washington, DC, Julie Goldscheid, Yolanda Wu, New York City, for amicus curiae, National Women's Law Center, Equal Rights Advocates, Women's Legal Defense Fund and NOW Legal Defense & Educ. Fund.
 Shellie Hoffman, Austin, TX, amicus curiae for Texas Ass'n of School Boards, Texas Ass'n of School Administrators & Texas Council of School Attorneys.
 Appeal from the United States District Court for the Southern District of Texas.
 Before GARWOOD, SMITH and DENNIS, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 This appeal presents the question of whether title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("title IX"), imposes liability on a school district for peer hostile environment sexual harassment.[1] We conclude that title IX does not impose such liability, absent allegations that the school district itself directly discriminated based on sex. Accordingly, the judgment of the district court is affirmed.
 
 I.
 
 2
 During the 1992-93 school year, students proceeding in this litigation under the pseudonyms of Jane and Janet Doe were eighth graders at Sam Rayburn Middle School in the Bryan Independent School District ("BISD") who rode a BISD school bus to and from school. Boys and girls were required to sit on different sides of the bus, and the bus driver, Bob Owens, enforced the restriction, even, on occasion, telling Jane and Janet not to sit on the boys' side of the bus.
 
 
 3
 Beginning in September 1992, a male student, whom we identify only by his initials, "G.S.," physically and verbally abused Janet on the bus. G.S. regularly swatted Janet's bottom whenever she walked down the aisle and made comments such as, "When are you going to let me fuck you?", "What bra size are you wearing?", and "What size panties are you wearing?" He also called Janet a "whore." At one point, G.S. groped Janet's genital area.
 
 
 4
 Janet complained to Owens no fewer than eight times that G.S. had swatted her and Jane on their bottoms and used foul language. Owens took down names on a pad of paper. Janet eventually stopped reporting the incidents.
 
 
 5
 On September 24, G.S. grabbed Jane in her genital area, and, a few minutes later, grabbed her breasts. Jane, Janet, and their parents visited Assistant Principal Randy Caperton the next day to complain about the incident.[2] Caperton told the Rowinsky family that he had already heard about the sexual assault from another student and that he believed the nature of the assault merited expelling G.S. Caperton suspended G.S. from riding the bus for three days and required him to sit in the second row behind the driver.
 
 
 6
 On September 29, Mrs. Rowinsky visited Caperton again to discuss the incident, complaining that other girls were being harassed on the bus. Caperton showed her a bus report that documented the incident with Jane. The report, however, contained numerous inaccuracies, including the fact that it did not name G.S. and listed the wrong date and length of punishment. Caperton corrected the assailant's name in a new report.
 
 
 7
 The three-day suspension did not deter G.S. He violated the seating requirement, and, as a result, Owens restricted Jane and Janet to the front of the bus. Mrs. Rowinsky called Jay Anding, assistant director of the transportation office, and demanded that he restrict G.S. to the second row seat because of the continuing remarks and misbehavior. Anding told Mrs. Rowinsky that he would speak with Owens. In late November 1992, G.S., with Owens nearby, called the girls offensive names and slapped Janet's buttocks. Owens did nothing, and the girls did not file any complaints.
 
 
 8
 One morning in December 1992, another male student, whose initials are "L.H.," reached up Janet's skirt, made a crude remark about what he almost touched, and then grabbed her genital area. Janet complained to Owens at the next stoplight, but he "just stared into space." On the afternoon of December 16, L.H. reached up Jane's skirt, touching her near her panty line. Jane did not tell Owens about the incident.
 
 
 9
 On December 18, Mrs. Rowinsky contacted Anding regarding L.H.'s behavior and told Anding that other girls were being sexually assaulted and gave him their names. Anding said he would investigate the alleged problems on the bus and take action.
 
 
 10
 On January 12, 1993, Mrs. Rowinsky contacted Caperton to find out the results of the investigation. Caperton told her that Anding had not conducted the investigation but that L.H. had been suspended for three days.[3]
 
 
 11
 On January 13, Mrs. Rowinsky contacted Dr. Tom Purifoy, BISD director of secondary education, and described the assaults to him. Purifoy did not conduct an independent investigation but referred her to C.W. Henry, Anding's assistant.
 
 
 12
 On January 14, after reviewing videotapes from the bus, Henry assigned a new driver to replace Owens. There are no further allegations of harassment by G.S. thereafter.
 
 
 13
 On January 19, the driver assigned Jane the seat next to G.S. Although G.S. made no new assaults, Mrs. Rowinsky removed her daughters from the bus and, on January 22, requested that Purifoy remove G.S. from the bus. Purifoy refused to take any further action against G.S. without proof of the assaults from juvenile records.
 
 
 14
 On March 30, during class, a third male student, with the initials "F.F.," reached under Janet's shirt and unfastened her bra. The teacher in the classroom sent both students to Vice-Principal Sandra Petty, who sent Janet back to class and suspended F.F. for the rest of the day and the next day. F.F. is not alleged to have harassed or abused the girls further. The next day, Mrs. Rowinsky visited Petty and complained about F.F.'s behavior; Petty responded that she did not consider F.F.'s conduct to be sexual.
 
 
 15
 On March 30, Mrs. Rowinsky and her attorney met with Dr. Sarah Ashburn, BISD superintendent, to complain about G.S.'s behavior. Ashburn said the three-day bus suspension was sufficient punishment. She did not inform them about the existence of title IX or any title IX grievance procedures.
 
 
 16
 On May 4, Mrs. Rowinsky met with Ashburn and complained about her failure to take action against G.S. and L.H. Ashburn considered her actions against G.S. sufficient and informed Mrs. Rowinsky that she did not deem what had happened to Jane and Janet to be assaults. She refused to take further action, in part because L.H. was no longer a student in BISD. Mrs. Rowinsky told Ashburn that she intended to file a grievance with the United States Department of Education Office of Civil Rights ("OCR").
 
 II.
 
 17
 Debra Rowinsky brought this action for herself[4] and as next friend, on behalf of her minor daughters, Jane and Janet Doe, and all those similarly situated,[5] alleging that BISD and its officials[6] condoned and caused hostile environment sexual harassment.[7] Specifically, the complaint asserts that Janet was sexually harassed at Sam Rayburn Middle School ("the school") by a student and that Jane and Janet were sexually harassed by other school children while riding the BISD school bus. Rowinsky seeks declaratory and injunctive relief, as well as compensatory damages and attorney's fees under title IX.
 
 
 18
 The district court held that Rowinsky had failed to state a claim under title IX because there was no evidence that BISD had discriminated against students on the basis of sex; Rowinsky had failed to provide evidence that sexual harassment and misconduct was treated less severely toward girls than toward boys.
 
 
 19
 The court relied on a number of facts. The first was that boys who assaulted boys were punished in the same fashion as boys who assaulted girls. The court concluded that any disparity in punishments between particular incidents was not made on the basis of sex, because the individual incidents involved different levels of physical conduct. Moreover, misconduct by one of the harassers was never reported by the students. The second factor was that any failure to train employees would harm male and female victims of harassment equally.
 
 III.
 
 20
 Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activities receiving Federal financial assistance." 20 U.S.C. § 1681(a) (1993). At issue here is whether a school district may be liable under title IX when one student sexually harasses another.[8] At a broader level of generality, we are asked to decide whether the recipient of federal education funds can be found liable for sex discrimination when the perpetrator is a party other than the grant recipient or its agents.[9]
 
 
 21
 The linchpin of Rowinsky's theory is the assumption that a grant recipient[10] need not engage in prohibited conduct to violate title IX. The specific statutory phrase at issue is the prohibition that "[n]o person be subjected to discrimination under any educational program or activities." Rowinsky focuses solely upon that phrase and argues that "under" means "in" and not "by." By making this substitution, she reasons that the statute cannot be limited to acts of discrimination by grant recipients.[11]
 
 A.
 
 22
 As with any statute, our starting point in determining the scope of title IX is the statutory language. Bailey v. United States, --- U.S. ----, ----, 116 S.Ct. 501, 504, 133 L.Ed.2d 472 (1995); North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 520, 102 S.Ct. 1912, 1917, 72 L.Ed.2d 299 (1982). Rowinsky's interpretation of title IX relies on isolating the prohibition against discrimination and recognizing that the statutory phrase does not, on its own, limit title IX to the acts of grant recipients. Determining the plain meaning of a statutory word or phrase, however, is only the starting point in statutory construction. "We consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. '[T]he meaning of statutory language, plain or not, depends on context.' " Bailey, --- U.S. at ----, 116 S.Ct. at 506. Thus, even if, arguendo, "under" means "in," this does not fully answer the interpretive question; we must look to the remainder of the statute to see whether there are any limits on "who" is prohibited from discriminating against students "in" an educational program.
 
 
 23
 We begin by noting that the text of title IX does not provide an unambiguous answer to the question. The title contains three general prohibitions: No person shall be excluded from participation in a program, denied the benefits of a program, or subjected to discrimination under a program. As is the case with the prohibition on discrimination, each of the other prohibitions, taken in isolation, is not explicitly limited to the acts of grant recipients.
 
 
 24
 Take, for example, the first prohibition. It reads as follows: No person ... shall ... be excluded from participation in ... any educational program." Like the prohibition on discrimination, this proscription could encompass the acts of third parties.
 
 
 25
 On the other hand, the open-ended language of title IX does not support an inference that the statute applies to the conduct of third parties. Title IX was drafted in a way that identifies a benefited class in order to imply a private right of action.[12] Congress did not simply prohibit grant recipients from engaging in certain conduct, because to do so would be inconsistent with creating justiciable rights for its beneficiaries. Thus, the language of title IX is driven not by the desire to leave the class of wrongdoers undefined, but by the nature of the right protected.[13]
 
 
 26
 Despite the ambiguity in the text, three factors weigh in favor of interpreting title IX to impose liability only for the acts of grant recipients. The first is the scope and structure of the title itself; the second is the legislative history; the third is agency interpretations of the statute.
 
 B.
 
 27
 The fact that title IX was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients. As an exercise of Congress's spending power,[14] title IX makes funds available to a recipient in return for the recipient's adherence to the conditions of the grant. While it is plausible that the condition imposed could encompass ending discriminatory behavior by third parties, the more probable inference is that the condition prohibits certain behavior by the grant recipients themselves.
 
 
 28
 This is so because the value of a spending condition is that it will induce the grant recipient to comply with the requirement in order to get the needed funds. In order for the coercion to be effective, the likelihood of violating the prohibition cannot be too great. This is especially true when the spending condition also includes an implied right of action.
 
 
 29
 Imposing liability for the acts of third parties would be incompatible with the purpose of a spending condition, because grant recipients have little control over the multitude of third parties who could conceivably violate the prohibitions of title IX.[15] Thus, the possibility of a violation would be so great that recipients would be induced to turn down the grants. We find it unlikely that Congress would impose conditions on federal funds that would render the funds so unattractive to potential recipients, because to do so would render the conditions almost useless.
 
 
 30
 The structure of title IX supports the conclusion that the spending conditions apply only to the conduct of grant recipients. With the exception of the one phrase upon which Rowinsky relies, the statute discusses discrimination by grant recipients. For example, numerous provisions exempt certain entities from coverage.[16] Other provisions exempt certain practices.[17] The statute's emphasis on grant recipients supports a conclusion that the statute applies only to the practices of the recipients themselves.
 
 C.
 
 31
 The legislative history of title IX also supports limiting the statute to the practices of grant recipients. The Supreme Court has repeatedly stated that the purpose of title IX is to prevent discrimination by grant recipients. In Cannon, the Court reviewed the legislative history of title IX and concluded that
 
 
 32
 title IX, like its model title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.
 
 
 33
 441 U.S. at 704, 99 S.Ct. at 1961 (emphasis added).[18]
 
 
 34
 Throughout the legislative history, both supporters and opponents of the amendment focused exclusively on acts by the grant recipients. Senator Bayh introduced the amendment and listed the types of sex discrimination, all by grant recipients, that prompted the legislation. 118 Cong.Rec. at 5803 (1972) ("It is clear to me that sex discrimination reaches into all facets of education--admissions, scholarship programs, faculty hiring and promotion, professional staffing, and pay scales."). The senator described the "heart" of the amendment as "a provision banning sex discrimination in educational programs receiving Federal funds. The amendment would cover such crucial aspects as admissions procedures, scholarships, and faculty employment, with limited exceptions." Id.[19]
 
 
 35
 Numerous other statements support the conclusion that title IX targets only acts by the grant recipients. Senator Bayh discussed the general prohibition against sex discrimination:
 
 
 36
 Central to my amendment are sections 1001-1005, which would prohibit discrimination on the basis of sex in federally funded education programs....
 
 
 37
 This portion of the amendment covers discrimination in all areas where abuse has been mentioned--employment practices for faculty and administrators, scholarship aid, admissions, access to programs within the institution such as vocational education classes, and so forth.
 
 
 38
 118 Cong.Rec. at 5807. In a colloquy with Senator Pell, Senator Bayh stated:
 
 
 39
 As the Senator knows, we are dealing with three basically different types of discrimination here. We are dealing with discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and discrimination in employment within an institution, as a member of a faculty or whatever.
 
 
 40
 Id. at 5812.
 
 
 41
 The drafters of title IX recognized that it was not a panacea for all types of sex discrimination, but rather a limited initial attempt to end discrimination by educational institutions. Again, Senator Bayh recognized that
 
 
 42
 [w]hile the impact of this amendment would be far-reaching, it is not a panacea. It is, however, an important first step in the effort to provide for the women of America something that is rightfully theirs--an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.
 
 
 43
 Id. at 5808.
 
 
 44
 Further evidence that title IX was not intended as a cure for all types of discrimination comes from the fact that the original amendment mandated a study of sex discrimination in order to suggest further legislative remedies. Id. at 5803. Such a requirement--and the recognition that further legislation might be necessary--would be superfluous under Rowinsky's interpretation of title IX.
 
 D.
 
 45
 The OCR's interpretation of title IX is consistent with refusing to impose liability for the acts of third parties.[20] The primary interpretation of title IX is found in its implementing regulations. See 34 C.F.R. § 106.31. The entire section is devoted to acts by the recipients themselves.[21]
 
 
 46
 The most definitive statement by the OCR on sexual harassment focuses on conduct by employees or agents of the recipient. The OCR's Policy Memorandum contains the following definition:
 
 
 47
 Sexual harassment consists of verbal or physical conduct of a sexual nature, imposed on the basis of sex, by an employee or agent of the recipient, that denies, limits, provides different, or conditions the provision of aid, benefits, services or treatment protected under title IX.
 
 
 48
 OCR Policy Memorandum from Antonio J. Califa, Director of Litigation, Enforcement, and Policy Service, to Regional Civil Rights Directors (Aug. 31, 1981) (emphasis added). In particular, the agency left unresolved the issue of peer sexual harassment. Id. at 10 ("The other unresolved issue relates to a recipient's responsibility for the sexual harassment acts of students against fellow students in the context of the situation in which neither student is in a position of authority, derived from the institution, over the other students.").[22]
 
 
 49
 The only OCR documents to apply title IX to peer sexual harassment, i.e., recent Letters of Finding, should be accorded little weight. Any weight the letters do have are outweighed by both the implementing regulations and the Policy Memorandum promulgated by the OCR. As a legislative regulation, the implementing regulations found at 59 C.F.R. § 106 are accorded far greater deference than are interpretive regulations such as Letters of Finding. Harris, 622 F.2d at 613. The Policy Memorandum deserves more deference because it represents a deliberate policy statement by the agency and is consistent with past agency interpretations. See id.
 
 
 50
 Even standing alone, the Letters of Finding should be accorded very little deference, because none of the traditional factors supporting deference are present. The letters are promulgated during investigations of specific institutions, and their purpose is to compel voluntary compliance by an offending institution. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1456 (9th Cir.1995). Because of the pressures to settle in an investigation, the circumstances surrounding their promulgation are significant. Accord Harris, 622 F.2d at 613. In addition, the OCR has only recently treated complaints of peer harassment as within its jurisdiction. Id. Finally, the letters do not reflect the deliberate consideration of a rulemaking proceeding. Id.
 
 
 51
 The only agency interpretation to support Rowinsky's position involves title VI. The OCR considers peer hostile environment racial harassment a violation of title VI. 59 Fed.Reg. 11448, 11449 (1994). Nothing in the regulations or commentary explains why title VI applies to the acts of non-recipients. The only analysis the OCR makes is to cite title VII cases for the proposition that a hostile environment can be discrimination. Id. at 11451. Absent a reasoned explanation for why the statutory language supports applying title VI to peer harassment, the OCR's interpretation should not be accorded any deference.
 
 IV.
 
 52
 This case was decided by the district court on motion for summary judgment. On the question of whether there was a genuine issue of material fact as required by FED.R.CIV.P. 56, we conclude that under the legal standard articulated by the district court, and affirmed by this court, the plaintiff has failed to allege or provide evidence that supports a cause of action under title IX.
 
 
 53
 The mere existence of sexual harassment does not necessarily constitute sexual discrimination. Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir.1982), adopted in Meritor Sav. Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Barnes v. Costle, 561 F.2d 983, 990 n. 55 (D.C.Cir.1977). Both men and women can be the victims or perpetrators of sexual harassment. Schneider, supra note 9, at 531 n. 30. For example, this circuit has recognized that same-sex sexual harassment is not always sex discrimination under title VII.[23] In the same vein, sexual overtures directed at both sexes, or behavior equally offensive to both males and females, is not sex discrimination. See Henson, 682 F.2d at 904.
 
 
 54
 In the case of peer sexual harassment, a plaintiff must demonstrate that the school district responded to sexual harassment claims differently based on sex. Thus, a school district might violate title IX if it treated sexual harassment of boys more seriously than sexual harassment of girls, or even if it turned a blind eye toward sexual harassment of girls while addressing assaults that harmed boys. As the district court correctly pointed out, however, Rowinsky failed to allege facts to support such a claim. The judgment is AFFIRMED.
 
 
 55
 DENNIS, Circuit Judge, dissenting.
 
 
 56
 This case presents the question whether the plaintiffs, "Jane Doe" and "Janet Doe," eighth grade students in a school system receiving federal funds, may maintain a federal court action under Title IX of the Educational Amendments, 20 U.S.C. § 1681, for monetary damages, a declaratory judgment and injunctive relief against the school board. The plaintiffs alleged and showed that the board failed to take appropriate corrective action after it received knowledge of the plaintiffs' sexual harassment by male students that created for the plaintiffs a hostile educational environment. The district court granted the school board's motion for summary judgment, holding that Jane and Janet Doe had failed to state a claim because they did not allege or show that the board discriminated against them by affording male students greater protection from sexual abuse than females. The majority of this panel affirms, holding similarly, that "[i]n the case of peer sexual harassment, a plaintiff must demonstrate that the school district responded to sexual harassment claims differently based on sex. Thus, a school district might violate title IX if it treated sexual harassment of boys more seriously than sexual harassment of girls, or even if it turned a blind eye toward sexual harassment of girls while addressing assaults that harmed boys." Maj. op. at 1016. Because I believe that the plaintiffs have stated valid claims for the relief requested under Title IX, and are entitled to proceed to trial thereon,[1] I respectfully dissent.[2]
 
 I.
 
 57
 In reviewing the district court's grant of summary judgment, this court applies the same standard of review as the district court. Garcia v. Elf Atochem North America, 28 F.3d 446, 449 (5th Cir.1994), Jurgens v. E.E.O.C., 903 F.2d 386, 388 (5th Cir.1990). The pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, must demonstrate there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Id. Under this standard, factual findings and inferences are considered with deference to the nonmovant. Garcia, 28 F.3d at 449.
 
 
 58
 The facts emerging from the pleadings and motion for summary judgment filings are set forth in detail in the majority opinion. There can be no doubt that these facts, viewed in the light most favorable to the plaintiffs for purposes of our summary judgment review, demonstrate that the school board knowingly failed to take appropriate steps to protect Jane and Janet Doe from sexual harassment, abuse and discrimination by male students that was sufficiently severe or pervasive as to create a hostile and abusive educational environment for the plaintiffs. Neither the district court nor the majority express disagreement with this conclusion. Their decisions rather are that as a matter of law female students do not have a right of action under Title IX against any educational institution receiving federal funds on the ground that the institution has knowingly allowed male students to create a hostile educational environment by sexual harassment of those students.
 
 II.
 
 59
 Title IX of the Education Amendments Act of 1972 prohibits sex discrimination in any educational program or activity receiving federal financial assistance:
 
 
 60
 No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....
 
 
 61
 20 U.S.C. § 1681(a). It is undisputed that at the time of the sexual harassment and abuse of the plaintiffs the school board was an educational program receiving federal financial assistance.
 
 
 62
 Supreme Court precedent interpreting the scope of Title IX establishes that the statute creates a broad federal protection privately enforceable by beneficiaries of the act. In Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that Title IX is enforceable through an implied right of action by certain classes of private parties. The Court applied the four factors set forth in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26 (1975), for analyzing whether a private right of action is to be implied under a federal statute: (1) is the plaintiff one of the class for whose especial benefit the statute was enacted? (2) is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? (3) is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? and (4) is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? The Court concluded that notwithstanding Title IX's failure to expressly authorize a private right of action, a woman who, because of her sex, is denied admission to an education program of an institution which receives federal financial assistance may maintain a federal action for violation of Title IX, since a woman who is discriminated against on the basis of sex is a member of the class for whose especial benefit Title IX was enacted; the legislative history indicates Congress' intent to create a private cause of action for a person excluded, on the basis of sex, from participation in a federally funded program; implication of a private remedy under Title IX is fully consistent with the orderly enforcement of Title IX; and the subject matter of private action under Title IX (invidious sex discrimination) does not involve an area basically of concern to the States. Having determined that private remedies are available under Title IX, the Court ended its analysis and refrained from addressing the specific types of private remedies available. Id. at 709, 717, 99 S.Ct. at 1963, 1968.
 
 
 63
 More recently, in Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court addressed the issue of remedies and held that the implied private right of action under Title IX includes a right to a claim for money damages. In Franklin, the plaintiff, a female high school student, filed suit under Title IX against a county school board receiving federal funds, alleging that she had been subjected to continual sexual harassment and abuse by a teacher and that, although administrators and other teachers became aware of and investigated the teacher's sexual harassment of her and other female students, no action was taken to halt the abuse and she was discouraged from pressing charges against the teacher. The district court dismissed the complaint on the ground that Title IX does not authorize an award of damages. The court of appeals affirmed. Franklin v. Gwinnett County Public Schools, 911 F.2d 617 (11th Cir.1990), rev'd by 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).
 
 
 64
 The Supreme Court reversed, basing its holding that a damages remedy is available for an action brought to enforce Title IX primarily on the longstanding general rule that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute. Franklin, 503 U.S. at 66-68, 112 S.Ct. at 1032-34 (citing, inter alia, Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).[3] In examining Title IX to determine whether Congress had limited the remedies available, the Court observed that because the Cannon Court inferred a cause of action upon concluding that Title IX provided no express right of action, the silence of the pre-Cannon statutory text and legislative history on the issue of available remedies is neither surprising nor enlightening. Rather, the appropriate inquiry for the pre-Cannon period is the state of the law when Congress passed Title IX. Because, at that time, the traditional presumption in favor of all available remedies was firmly established, and the Court, in the decade prior to Title IX's enactment, had found implied rights of action in six cases and approved a damages remedy in three of them, the Court concluded that the lack of any legislative intent to abandon the traditional presumption was amply demonstrated. For the post-Cannon period, when Congress was legislating with full cognizance of that decision, the Court's analysis of the text and history of the two statutes enacted to amend Title IX--the Civil Rights Remedies Equalization Amendment of 1986 and the Civil Rights Restoration Act of 1987--established that Congress validated Cannon's holding and made no effort to alter the traditional presumption. See Franklin, 503 U.S. at 70-75, 112 S.Ct. at 1035-37.
 
 
 65
 In unanimously upholding the plaintiff's private cause of action,[4] moreover, the Franklin Court necessarily must have concluded that under the Cannon-Cort v. Ash analysis high school students whom the school board knowingly allows to be subjected to sexual harassment and abuse deleteriously affecting their educational environment are persons who have been discriminated against on the basis of sex and are therefore members of the class for whose especial benefit Title IX was enacted, for whom Congress intended to create a private cause of action, for whom implication of a private remedy under Title IX is fully consistent with its orderly enforcement, and that the subject matter of their private action under Title IX does not involve an area basically of concern to the states.
 
 
 66
 Most important to the case at bar, however, the Franklin Court interpreted Title IX as placing on the school board a duty not to discriminate on the basis of sex, by knowingly failing to take appropriate corrective action when a male teacher has sexually harassed and abused a female high school student and thereby created for her a hostile educational environment. The Court elaborated on this subject in rejecting the argument by the board and the government that the Court should not apply the traditional presumption in favor of appropriate relief because Title IX was enacted pursuant to Congress's Spending Clause power.[5] The Court explained:
 
 
 67
 In Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 [101 S.Ct. 1531, 67 L.Ed.2d 694] (1981), the Court observed that remedies were limited under such Spending Clause statutes when the alleged violation was unintentional. Respondents and the United States maintain that this presumption should apply equally to intentional violations. We disagree. The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. See id. at 17, 67 L.Ed.2d 694, 101 S.Ct. at 1540. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged. Unquestionably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64, 91 L.Ed.2d 49, 106 S.Ct. 2399 [2404] (1986). We believe the same rule should apply when a teacher sexually harasses and abuses a student. Congress surely did not intend for federal monies to be expended to support the intentional violations it sought to proscribe.
 
 
 68
 Franklin, 503 U.S. at 75, 112 S.Ct. at 1037. (Underscoring supplied; italics in original).
 
 
 69
 Accordingly, the Supreme Court in Franklin not only recognized a right to money damages as a remedy available under a private right of action based on an intentional violation of Title IX; the Court also acknowledged that an educational institution receiving federal funds intentionally violates Title IX and engages in sex discrimination against which the statute affords protection when it knowingly fails to take reasonable steps within its power to prevent the sexual harassment or abuse of a student by a teacher that is so severe or pervasive that it creates a hostile and harmful school atmosphere for that student. By citing Meritor Savings Bank, in which the Court held that a claim of "hostile environment" sex discrimination is actionable under Title VII, as analogous precedent for its interpretation of Title IX, the Court indicated that standards similar to those applied or adverted to in Meritor are appropriate criteria for determining when there has been a violation of Title IX giving rise to a claim of "hostile environment" sex discrimination.[6]
 
 
 70
 As explained in Meritor, as well as antecedent cases and EEOC Guidelines discussed therein, an employer's liability for "hostile environment" sex discrimination generally is based on the employer's failure to take reasonable corrective measures after receiving knowledge that an employee is being subjected to sexual harassment or abuse in the work environment by co-workers (or non-employees over whom the employer has a degree of control or legal responsibility). In other words, employer liability for hostile environment harassment by coworkers and non-employees under Title VII is predicated on the employer's failure to act in accordance with its statutory duty not to discriminate in the workplace on the basis of "race, color, religion, sex or national origin" with respect to its "terms, conditions, or privileges of employment," 42 U.S.C. § 200e-2(a)(1), by requiring an employee to work in an environment permeated with "discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment...."[7] Harris v. Forklift Systems, Inc., --- U.S. ----, ----, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting Meritor, 477 U.S. at 65, 67, 106 S.Ct. at 2404-2405, 2405). Consequently, the Franklin Court's recognition of this type of claim under Title IX necessarily indicates that a student subjected to severe sexual harassment by other students in the school environment may recover for damages sustained thereby from a federally funded educational institution if its board had knowledge of the harassment and failed to take appropriate corrective action.
 
 
 71
 In Meritor, the Supreme Court addressed for the first time a number of issues relating to Title VII hostile environment sexual harassment claims. Although the case involved a female bank employee who was allegedly subjected to sexual harassment by her male supervisor, and therefore did not directly address sexual harassment by nonsupervisory employees or non-employees, some of the principles enunciated by the Court apply generally to all cases in which discrimination based on sex creates a hostile or abusive work environment. The Court held that unwelcome sexual advances that create an offensive or hostile working environment may violate Title VII, and that when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex. This proposition was not challenged by any party in the case. It is implicit in the Court's opinion and explicit in authorities it cited with approval that the same principle applies to sexual harassment by co-workers and even strangers to the workplace: When a nonsupervisory employee or non-employee sexually harasses an employee, that co-worker or non-employee likewise discriminates on the basis of sex.
 
 
 72
 The Meritor Court noted that in 1980 the EEOC issued Guidelines specifying that sexual harassment, as there defined, is a form of sex discrimination prohibited by Title VII; and that as an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling on the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. In defining "sexual harassment," the Court observed, the Guidelines first describe the kinds of workplace conduct that may be actionable under Title VII, including unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, 29 C.F.R. § 1604.11(a) (1985), and provide that such sexual misconduct constitutes prohibited sexual harassment, whether or not it is directly linked to the grant or denial of an economic quid pro quo, where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. § 1604.11(a)(3). The Court found it significant that, in concluding that so called "hostile environment" (i.e., non quid pro quo ) harassment violates Title VII, the EEOC drew upon a substantial body of judicial decisions and EEOC precedent holding that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. See Meritor, 477 U.S. at 65-67, 106 S.Ct. at 2404-2406 (citing, inter alia, 45 Fed.Reg. 74676 (1980); Rogers v. EEOC, 454 F.2d 234 (5th Cir.1971), cert. denied, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); Henson v. Dundee, 682 F.2d 897 (11th Cir.1982)). In Henson, the Court of Appeals had observed that "[t]he environment in which an employee works can be rendered offensive in an equal degree by the acts of supervisors, coworkers, or even strangers to the workplace. The capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual." Id. at 910 (citations omitted).
 
 
 73
 Although the Court in Meritor expressly addressed only the subject of sexual harassment by a supervisor of a subordinate, the Court's heavy reliance on and approval of the EEOC guidelines, as well as the general principles it announced, strongly imply also the Court's approval of the EEOC Guidelines regarding sexual harassment by non-supervisory co-workers and non-employees. Those Guidelines, in pertinent part, provide:
 
 
 74
 With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action. § 1604.11(d)
 
 
 75
 An employer may also be responsible for acts of non-employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees. § 1604.11(e)
 
 
 76
 The rule expressed by the Guidelines pertaining to sexual harassment by non-supervisory co-workers has been uniformly applied by the courts. It is not a controversial area; results in each case simply depend on an interpretation of the facts: whether the employer had sufficient notice, investigated properly, disciplined offenders, and so forth. See 3 Larson, Employment Discrimination § 46.07[a] (2d ed. 1995) and authorities cited therein.[8] The rule pertaining to non-employees, while involving fewer cases, appears equally uncontroversial. Id. § 46.07[b].
 
 
 77
 In summing up the post-EEOC Guidelines jurisprudence, the Court in Meritor stated:
 
 
 78
 Since the Guidelines were issued, courts have uniformly held, and we agree, that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. As the Court of Appeals for the Eleventh Circuit wrote in Henson v. Dundee, 682 F.2d 897, 902 (1982):
 
 
 79
 "Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets."
 
 
 80
 Meritor, 477 U.S. at 66, 106 S.Ct. at 2405 (additional authorities omitted). By the same token, the Court in Franklin evidently recognized that sexual harassment which creates a hostile or offensive educational environment for members of one sex is every bit the arbitrary barrier to sexual equality in the educational environment that racial harassment is to racial equality. Surely, a requirement that a male or female junior high school student run a gauntlet of sexual abuse in return for the privilege of receiving an education can be as demeaning and disconcerting as the harshest of racial epithets. Indeed, although the Supreme Court has not yet been presented with a "goose" case, it is difficult to imagine that it would not conclude that the knowing failure to curb student on student sexual harassment is actionable after holding that a knowing failure to eliminate teacher-student sexual harassment is grounds for a Title IX damage suit.
 
 
 81
 The Supreme Court was not entirely clear, however, about what it meant in Franklin when it said that "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. See [Pennhurst State School and Hospital v. Halderman, 451 U.S.] at 17, 101 S.Ct. at 1539-40. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged." Franklin, 503 U.S. at 74-75, 112 S.Ct. at 1037. The trouble is that the passage in Pennhurst cited by the Court does not speak expressly in terms of "unintentional violations" or "intentional discrimination." In Pennhurst, the Court was presented with the issue of whether Section 6010 of the Developmentally Disabled Assistance and Bill of Rights Act (42 U.S.C. § 6010) created in favor of the mentally retarded any substantive rights to "appropriate treatment" in the "least restrictive" environment. After concluding that the Act was enacted solely pursuant to the Spending Clause, the Court reasoned:
 
 
 82
 Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. Unlike legislation enacted under § 5 [of the Fourteenth Amendment], however, legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.
 
 
 83
 Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539-40, 67 L.Ed.2d 694 (1981) (emphasis added).
 
 
 84
 Because Franklin itself clearly holds that Title IX satisfies the Pennhurst notice requirement in placing a duty on school boards to counteract known hostile environment sexual harassment of students, so that the school board voluntarily and knowingly accepted the terms of the "contract," and that a board's failure to perform its duty is an "intentional" violation of Title IX, it is difficult to decipher exactly what the Court meant by the Pennhurst passage. Perhaps the Franklin Court's discussion of Pennhurst was only intended to put Congress and other concerned parties on notice that statutes which do not speak as clearly as Title IX in proclaiming that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance" might not be construed so as to afford a private right of action for their enforcement. Alternatively, the Court's expression may have been intended to limit the right of action under Title IX based on hostile environment sexual harassment claims to the situation in which the federal funds recipient has actual knowledge, or perhaps constructive notice (which is its legal equivalent), and fails to take appropriate corrective action, rather than in every situation in which the recipient "should have known," in the ordinary negligence sense, of the sexual harassment.
 
 
 85
 In any event, it is clear from the plaintiffs' allegations and filings in opposition to the motion for summary judgment that they have stated a claim under Title IX because the facts adduced, viewed most favorably to them, show that the school board had actual knowledge that the plaintiffs were being subjected to sexual harassment and abuse sufficiently severe and pervasive as to create for them a hostile and offensive educational environment, and that the board failed to take appropriate corrective action. Indeed, it would appear that the school board in the case at bar was given as much, if not more, knowledge and notice of the ongoing sexual harassment of the plaintiffs as was given the school board in the Franklin case. When a male student or even a stranger sexually harasses a female student within the school environment under the board's control, he discriminates on the basis of sex just as much as did the teacher in the Franklin case. Although the Court did not spell out the analogy to Meritor fully by stating that the school board's failure to take corrective action after gaining actual knowledge of the sexual harassment, this meaning is implicit from the Court's citation of Meritor. The Supreme Court reversed the court of appeals' affirmance of the district court's dismissal of Franklin's complaint and remanded the case for further proceedings. This court should therefore reverse the district court's summary judgment against the plaintiffs and remand this case for trial or further proceedings.
 
 
 86
 Apparently underlying the majority's conclusion that summary judgment is appropriate here is the incorrect assumption that, in general, school boards have no duty with respect to students' safety and no power of discipline to control educationally pernicious student conduct. See maj. op. at 1013. Even if the school board had not accepted federal funds, however, it owes a much higher duty to its students and has far greater powers of control over them than that described in the majority opinion. In Vernonia School District 47J v. Acton, --- U.S. ----, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), the Supreme Court held that a school board may require all participants in high school athletic programs to submit to urinanalysis tests for drugs regardless of whether any grounds existed to suspect a particular athlete. As partial justification for granting the board this much disciplinary power over students, the court concluded that while the state does not owe a student the same constitutional duty of protection that it owes a prisoner in its full time custody, the student is nevertheless within the temporary custody of the state while in public school and the state also has a tutelary duty to promote and inculcate good morals, health and self discipline among its students.[9] The Court observed that its earlier decision in New Jersey v. T.L.O., 469 U.S. 325, 335, 105 S.Ct. 733, 739, 83 L.Ed.2d 720 (1985)
 
 
 87
 did not deny, but indeed emphasized, that the nature of that power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults. "[A] proper educational environment requires close supervision of schoolchildren, as well as the enforcement of rules against conduct that would be perfectly permissible if undertaken by an adult." ... While we do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional "duty to protect," ... we have acknowledged that for many purposes "school authorities ac[t] in loco parentis," ... with the power and indeed the duty to "inculcate the habits and manners of civility," ... Thus, while children assuredly do not "shed their constitutional rights ... at the schoolhouse gate," ... the nature of those rights is what is appropriate for children in schools.
 
 
 88
 Id., --- U.S. at ----, 115 S.Ct. at 2392 (emphasis added). See also Johnson v. Dallas Independent School Dist., 38 F.3d 198, 208 n. 7 (5th Cir.1994) ("Schools ... take care of children day after day for years in public facilities. Schools may be said to control children's environments to the same or even greater degree than state-sponsored foster care services, which have been held, post-DeShaney, to bear affirmative obligations to their client children. * * * That parents yield so much of their children's care into the hands of public school officials may well be argued to place upon the officials an obligation to protect students at least from certain kinds of foreseeably dangerous harm during regular school hours."), cert. denied, --- U.S. ----, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995).
 
 
 89
 For all of the foregoing reasons, I cannot agree with my colleagues that the school board's dereliction amounts to nothing more serious in law than the situation in which a bystander witnesses the drowning of a complete stranger. Unquestionably, because the school board has accepted federal financial assistance, Title IX places upon it a duty to take appropriate measures to protect students from being subjected in the school environment to sexual harassment, abuse and discrimination of which the board has actual knowledge. As Jane and Janet Doe presented evidence sufficient to survive summary judgment that the school board failed to do so here, the district court's judgment should be vacated and the case remanded for further proceedings.
 
 
 
 [1]
 Title IX is enforceable through an implied right of action. Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)
 
 
 [2]
 The Rowinskys filed sexual assault charges against G.S. with the Bryan city police
 
 
 [3]
 L.H. is not alleged to have further harassed or abused the girls after his suspension
 
 
 [4]
 We conclude that Rowinsky does not have standing to assert a personal claim under title IX. It is undisputed that she has standing, as next of friend, to assert the claims of her daughters, but nothing in the statutory language provides her with a personal claim under title IX. Even assuming that title IX protects persons other than students and employees, Rowinsky has failed assert that she was excluded from participation, denied the benefits of, or subjected to discrimination under any education program or activity. Absent such a claim, the plain language of title IX does not support a cause of action by Rowinsky
 
 
 [5]
 The district court did not rule on the request for class certification. The plaintiffs do not complain of that failure on appeal
 
 
 [6]
 The district court dismissed all claims against the officials of BISD, leaving the school district as the only defendant. Rowinsky has not appealed that decision
 
 
 [7]
 In his dissent, Judge Dennis opines that under the alleged facts, the school board "knowingly failed to take appropriate steps to protect Jane and Janet Doe from sexual harassment, abuse and discrimination...." Dissent at 2982. We express no normative view regarding BISD's conduct, for our duty as a court is only to decide whether the alleged conduct or neglect is actionable under title IX
 
 
 [8]
 Two months after this case was argued, the Eleventh Circuit held that title IX imposes liability on a school district for peer sexual harassment. Davis v. Monroe County Bd. of Educ., 74 F.3d 1186 (11th Cir.1996), suggestion for rehearing en banc filed. Nothing in Davis alters our analysis, however. As will become evident, we disagree with the Eleventh Circuit's statutory construction and selective use of legislative history
 With the exception of the Eleventh Circuit, no circuit court of appeals has found a school district liable for peer sexual harassment. In a qualified immunity case, the Ninth Circuit assumed arguendo that title IX applies to peer harassment but granted immunity because the law was not clear at the time of the incident. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447 (9th Cir.1994) (denying relief on qualified immunity grounds but noting that under current law qualified immunity would not protect a school official from liability in a peer sexual harassment claim).
 Another circuit assumed arguendo that sexual harassment by a third party is actionable under title IX, but denied relief on alternative grounds. See Murray v. New York Univ. College of Dentistry, 57 F.3d 243 (2d Cir.1995) (finding no liability when patient harassed a dental student because the university did not have sufficient notice of the harassment). The analysis in Murray, however, is not persuasive, as the case should be properly understood as an employment suit: First, the court analyzed the case as an employment case. Second, the unique nature of dental and medical schools makes its students quasi-employees. See Lipsett v. University of P.R., 864 F.2d 881, 897 (1st Cir.1988) (applying title VII standards to a peer harassment case in a medical school because medical students should be viewed as employees).
 
 
 [9]
 The dissent, perhaps recognizing the weakness of Rowinsky's argument, circumvents this issue by claiming that a student is an agent of the grant recipient. See Dissent at 1024 (citing Vernonia Sch. Dist. 47J v. Acton, --- U.S. ----, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). The dissent's approach is novel and, in our view, erroneous
 Acton and its predecessor, New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), stand for the proposition that the Constitution does not preclude a public school's having the power to discipline and control students who are in its care. Recognizing that a school has the power to discipline a student is a far cry from making the student an agent of the school. Johnson v. Dallas Indep. Sch. Dist., 38 F.3d 198 (5th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995), also lends no support to the dissent's theory. Even if, arguendo, there were an obligation to protect students from foreseeably dangerous harm, such a duty would not transform the relationship between school and student into an agency relationship. See also Walton v. Alexander, 44 F.3d 1297 (5th Cir.1995) (en banc) (no duty to protect student, attending voluntarily, from third party non-state actors).
 
 
 [10]
 For purposes of this opinion, we refer to both the grant recipient and its agents as grant recipients
 
 
 [11]
 The second step in Rowinsky's argument is to interpret the word "discrimination" to include hostile environment sexual harassment. See Davis, 74 F.3d at 1193 ("Thus, we conclude that as Title VII encompasses a claim for damages due to a sexually hostile working environment created by co-workers and tolerated by the employer, Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment.") (footnote and citations omitted). We believe, however, that importing a theory of discrimination from the adult employment context into a situation involving children is highly problematic
 At a theoretical level, the problem with sexual harassment is "the unwanted imposition of sexual requirements in the context of unequal power." Catherine MacKinnon, SEXUAL HARASSMENT OF WORKING WOMEN 1 (1979). In an employment context, the actions of a co-worker sometimes may be imputed to an employer through a theory of respondeat superior.
 In an educational setting, the power relationship is the one between the educational institution and the student. See Ronna G. Schneider, Sexual Harassment and Higher Education, 65 TEX.L.REV. 525, 533-36 (1987). In the context of two students, however, there is no power relationship, and a theory of respondeat superior has no precedential or logical support. Unwanted sexual advances of fellow students do not carry the same coercive effect or abuse of power as those made by a teacher, employer or co-worker. This is not to say that the behavior does not harm the victim, but only that the analogy is missing a key ingredient--a power relationship between the harasser and the victim.
 Even the dissent recognizes that employer liability for acts of non-supervisors is predicated on some theory of agency. See Dissent at 1020-1021 & n. 7 ("As explained in Meritor, ... an employer's liability for 'hostile environment' sex discrimination generally is based on the employer's failure to take reasonable corrective measures after receiving knowledge that an employee is being subjected to sexual harassment or abuse in the work environment by co-workers or non-employees over whom the employer has a degree of control or legal responsibility.").
 Title VII cases (cited by Rowinsky) that have found liability for harassment by third parties are inapplicable, because in those cases the power of the employer was implicated. See Sparks v. Regional Medical Ctr. Bd., 792 F.Supp. 735, 738 n. 1 (N.D.Ala.1992) (holding medical center responsible for sexual harassment of employee by independent-contractor physician); Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024 (D.Nev.1992) (blackjack dealer harassed by customers); Magnuson v. Peak Technical Servs., 808 F.Supp. 500 (E.D.Va.1992) (automobile supplier's representative harassed by dealership manager).
 The dissent's reliance on Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) for the inference that sexual harassment by students may be attributed to the school board is also misplaced. See Dissent at 1021, 1023. First, sexual harassment by a teacher falls within the framework of Meritor because a teacher is an employee of the grant recipient. Thus, like the normal sexual harassment case, it is an agent of the defendant who is guilty of the harassment. Second, any language in Franklin regarding teacher-student sexual harassment, is pure dictum; the district court dismissed, and the Eleventh Circuit affirmed dismissal under FED.R.CIV.P. 12(b)(6), based solely on the ground that compensatory relief was unavailable for violations of title IX. See Franklin v. Gwinnett County Pub. Sch., 911 F.2d 617, 618 (11th Cir.1990), rev'd, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).
 
 
 [12]
 Cannon, 441 U.S. at 690-93, 99 S.Ct. at 1955 ("There would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting title IX with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.")
 
 
 [13]
 Id. at 693 n. 13, 99 S.Ct. at 1955 n. 13 ("Put somewhat differently, because the right to be free of discrimination is a 'personal' one, a statute conferring such a right will almost have to be phrased in terms of the persons benefited.")
 
 
 [14]
 Although the Supreme Court has reserved the issue of whether title IX was enacted under the Spending Clause rather than § 5 of the Fourteenth Amendment, precedent strongly suggests that title IX, like its model, title VI, was enacted under the former. See Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 598-99, 103 S.Ct. 3221, 3230-31, 77 L.Ed.2d 866 (1983) (White, J.). In Guardians, at least five Justices held that title VI was enacted pursuant to the Spending Clause. See id. at 598-99, 103 S.Ct. at 3230-31 (White, J.); id. at 636-38, 103 S.Ct. at 3250-51 (Stevens, J. dissenting). Title IX was modeled after title VI and uses identical language, giving rise to an inference that title IX also was enacted pursuant to the Spending Clause
 An additional reason for interpreting title IX as a statute authorized by Congress's spending power is that the statute regulates purely private academic institutions. While the receipt of state funding may transform a private school into a state actor for Fourteenth Amendment purposes, the receipt of federal funds does not make a private school a state actor. Thus, any attempt to impose title IX liability on a private educational institution that receives no state funds would push the limits of the Fourteenth Amendment.
 Finally, the Court has been cautious about attributing Congressional intent to act under its authority to enforce the Fourteenth Amendment, "[b]ecause such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority." Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). Nothing in title IX demonstrates an intent to enforce the Fourteenth Amendment, and its language and structure demonstrate that it is a spending statute. "Surely Congress would not have established such elaborate funding incentives had it simply intended to impose absolute obligations on the States." Id. at 18, 101 S.Ct. at 1540.
 
 
 [15]
 Take, for example, a situation in which the parents of a female student discourage her from studying and taking advantage of opportunities at school because they believe that a woman should not concentrate on an education. If the school had knowledge of the parents' interference and did nothing to stop it, Rowinsky's logic would make the school liable under title IX. The argument would proceed as follows: The girl is being subjected to discrimination because the parents are treating her differently from boys; the girl is being denied the full benefits of the educational program because of the discrimination; and the school has done nothing to stop the discrimination
 
 
 [16]
 See, e.g., § 1681(a)(3) (exempting religious institutions if title IX is inconsistent with the religious tenets of the organization); § 1681(a)(5) (exempting traditional single-sex colleges); § 1681(a)(7) (exempting Boys State and Girls State programs)
 
 
 [17]
 See § 1681(a)(9) (beauty pageants)
 
 
 [18]
 See also Grove City College v. Bell, 465 U.S. 555, 577, 104 S.Ct. 1211, 1223, 79 L.Ed.2d 516 (1983) (Powell, J., concurring) ("The sole purpose of the statute is to make unlawful 'discrimination' by recipients of federal assistance programs."); id. at 585, 104 S.Ct. at 1227 (Brennan, J., concurring) ("As explained by its sponsor, the [precursor] amendment [to title IX] would have prohibited sex discrimination 'by any public institution of higher education or any institution of graduate education receiving Federal educational financial assistance.' ")
 
 
 [19]
 Although the statements of one legislator made during debate may not be controlling, Senator Bayh's remarks, coming from the sponsor of the language ultimately enacted, have been treated as authoritative to the statute's construction. See North Haven, 456 U.S. at 526-27, 102 S.Ct. at 1920-21. See also Federal Energy Admin. v. Algonquin SNG, Inc., 426 U.S. 548, 564, 96 S.Ct. 2295, 2304, 49 L.Ed.2d 49 (1976) (holding that statements by legislative sponsor "deserv[e] to be accorded substantial weight")
 
 
 [20]
 When interpreting title IX, we accord the OCR's interpretations appreciable deference. Cohen v. Brown Univ., 991 F.2d 888, 895 (1st Cir.1993). The deference accorded interpretive regulations depends on such factors as the circumstances of their promulgation, the consistency with which the agency has adhered to the position announced, the evident consideration which has gone into its formulation, and the nature of the agency's expertise. Board of Educ. v. Harris, 622 F.2d 599, 613 (2d Cir.1979) (citing Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977)), cert. denied, 449 U.S. 1124, 101 S.Ct. 940, 67 L.Ed.2d 110 (1981). Legislative regulations are accorded more than mere deference or weight. Id
 
 
 [21]
 Both Rowinsky and some district courts take the language of the implementing regulations out of context to support extending title IX to peer harassment. See Patricia H. v. Berkeley Unified Sch. Dist., 830 F.Supp. 1288, 1289 (N.D.Cal.1993) ("The implementing regulations of title IX forbid any sex-based limitation 'in the enjoyment of any rights, privilege, advantage or opportunity' related to federally funded education."). But, like any statute or regulation, the specific prohibition in 34 C.F.R. § 106.31(b)(7) must be read in context. The entire regulation is as follows:
 (b) Specific prohibitions. Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex:
 (7) Otherwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity.
 Read in context, the regulation prohibits recipients from limiting the rights, privileges, advantages or opportunities of students. The regulation cannot reasonably be read to include the actions of third parties.
 
 
 [22]
 It is no coincidence that the OCR leaves the issue of peer harassment unresolved. The OCR's source of jurisdiction over sexual harassment is 34 C.F.R. § 106.31(b). OCR Policy Memorandum at 1. As we have discussed, see supra note 19, § 106.31(b) prohibits discrimination by grant recipients. Sexual harassment by third parties is beyond the jurisdiction of the OCR unless the power of the school district is somehow implicated by the third party
 
 
 [23]
 See Blake v. City of Laredo, 58 F.3d 637 (5th Cir.1995) (per curiam) (unpublished) (holding that male-on-male sexual harassment does not state title VII claim); Garcia v. Elf Atochem N. Am., 28 F.3d 446, 452 (5th Cir.1994) (holding that male-on-male sexual harassment is not sex discrimination); Giddens v. Shell Oil Co., 12 F.3d 208 (5th Cir.1993) (per curiam) (unpublished) (holding that male-on-male harassment with sexual overtones is not sex discrimination without a showing that an employer treated the plaintiff differently because of his sex). But see Sardinia v. Dellwood Foods, 1995 WL 640502 (S.D.N.Y.1995); EEOC Guidelines on Sex Discrimination, 29 C.F.R. § 1604.11(b) (1986)
 
 
 [1]
 In reaching this conclusion, I am in agreement with the only other circuit court to squarely address this issue. See Davis v. Monroe County Board of Education, 74 F.3d 1186 (11th Cir.1996) (holding that "Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment."); see also Bosley v. Kearney R-1 School District, 904 F.Supp. 1006 (W.D.Mo.1995) (recognizing Title IX cause of action against school board for peer sexual abuse where the school board intentionally fails to take proper remedial action)
 
 
 [2]
 I join in the opinion only to the extent that it finds that Mrs. Rowinsky, the mother of Jane and Janet Doe, individually lacks standing under Title IX
 
 
 [3]
 The Court rejected an argument that the rule had disappeared in succeeding decades, citing several instances of its adherence to the traditional "any available relief" presumption. Discussing Guardians Assn. v. Civil Service Comm'n of New York City, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Court observed that ("[t]hough the multiple opinions in Guardians suggest the difficulty of inferring the common ground among the Justices in that case, a clear majority expressed the view that damages were available under Title VI [the closely analogous model for Title IX] in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action.") Franklin, 503 U.S. at 70, 112 S.Ct. at 1035. The Court also acknowledged that in Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), it had held that the 1978 amendment to § 504 of the Rehabilitation Act of 1973--which had expressly incorporated the "remedies, procedures, and rights set forth in title VI" (29 U.S.C. § 794a(a)(2))--authorizes an award of backpay. Franklin, 503 U.S. at 70, 112 S.Ct. at 1035. It is worth noting that in Darrone, the Court unanimously observed that a majority in Guardians had "agreed that retroactive relief is available to private plaintiffs for all discrimination, whether intentional or unintentional, that is actionable under Title VI." 465 U.S. at 631 n. 9, 104 S.Ct. at 1253 n. 9 (emphasis added)
 
 
 [4]
 The holding that Title IX implies a right of action for damages by a female student for "hostile environment" sexual harassment was unanimous. In a separate concurring opinion, Justice Scalia, joined by the Chief Justice and Justice Thomas, agreed with the Court's disposition of the case, observing that "[b]ecause of legislation enacted subsequent to Cannon, it is too late in the day to address whether a judicially implied exclusion of damages under Title IX would be appropriate." Franklin, 503 U.S. at 78, 112 S.Ct. at 1039 (Scalia, J., concurring)
 
 
 [5]
 Although the Court noted Franklin's argument that Title IX also rests on powers derived from § 5 of the Fourteenth amendment, the Court found it unnecessary to decide which power Congress utilized because it had concluded that a money damages remedy is available under Title IX for an intentional violation irrespective of the constitutional source of Congress' power to enact the statute. See Franklin, 503 U.S. at 75 n. 8, 112 S.Ct. at 1038 n. 8
 
 
 [6]
 The High Court's acknowledgment in Franklin that a school employee's sexual abuse of students is "unquestionably" sex discrimination prohibited by Title IX, moreover, demonstrates that, under the statute's broad directive, the term "discrimination" is not limited to the situations, such as admissions, scholarships, hiring and promotions, that appear to have been the focus of the congressional debates on the Educational Amendments. See maj. Op. at pp. 1013-1014] (discussing legislative history). Rather, a student is "excluded from participation in, [ ] denied the benefits of or subjected to discrimination under," 20 U.S.C. § 1681, a federally funded program when she is sexually abused by an employee of that program. Further, in finding that a school district can be liable under Title IX for the unauthorized acts of its agents, the Court established that a federally funded program may be liable for conduct extending beyond the practices, policies and decisionmaking directly attributable to it, even though Title IX's language is not expressly directed to conduct of the program's agents or others
 
 
 [7]
 In Meritor, the Court held that the court of appeals had erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. The Court observed, however, that under agency principles absence of notice to the employer will not necessarily insulate it from liability for a supervisor's sexual harassment. 477 U.S. at 69-73, 106 S.Ct. at 2406-2409. The present case does not require that we address the issue of vicarious liability by the school board because the plaintiffs here have alleged and shown that the school board was itself negligent because it had knowledge of the sexual harassment and failed to take appropriate corrective measures
 The majority states on page 1011, footnote 11, of its opinion that my acknowledgement that an employer is liable for its knowing failure to take reasonable steps to correct co-worker or non-employee harassment "recognizes that employer liability for the acts of non-supervisors is predicated on some theory of agency," and that my reliance on Franklin is misplaced here because in that case the sexual harassment by a teacher fell within the Meritor framework because a teacher is an agent of the school board. The majority thus suggests that under agency principles, employer liability is necessarily based on some form of vicarious liability. It is certainly recognized under agency principles that a principal may be vicariously liable for the acts of agents under certain circumstances. Nonetheless, agency law also recognizes that direct liability is imposed on principals for their tortious conduct. See, e.g. id. § 219(2) (master is liable for torts of servants acting outside the scope of their employment if "(a) the master intended the conduct or consequences, or (b) the master was negligent or reckless, or (c) the conduct violated a non-delegable duty of the master...."). The fact that the law of agency incorporates principles of tort liability thus does not detract from the recognition that in the context of hostile environment harassment by non-supervisors, an employer's liability is not vicarious, but is directly predicated on its own negligent conduct in breaching a duty to act imposed by Title VII. See RESTATEMENT 2 D OF TORTS § 284(b) (negligent conduct includes "a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do); see also Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464-65 (7th Cir.1990) (discussion of employer liability for co-worker sexual harassment). As Judge Posner explains in Guess, the use of the term "respondeat superior" to describe employer liability in this context is a misnomer. Rather the "knew or should have known" standard imposes
 a negligence standard that closely resembles the 'fellow servant rule' [under which] the employer, provided it has used due care in hiring the offending employee in the first place, is liable for that employee's torts against a coworker only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action.
 Id. at 465.
 
 
 [8]
 The Guidelines did not introduce this liability standard into the Title VII context. Prior to the EEOC's enactment of the Guidelines, lower courts had recognized that an employer may be liable under Title VII if it knowingly failed to remedy a discriminatory work atmosphere caused by the acts of co-workers. See, e.g. DeGrace v. Rumsfeld, 614 F.2d 796, 803-05 (1st Cir.1980) (employer may be liable for allowing racial harassment by co-workers); Higgins v. Gates Rubber Co., 578 F.2d 281, 283 (10th Cir.1978) (Title VII violation requires showing that employer was aware or should have been aware of discriminatory work environment), E.E.O.C. v. Murphy Motor Freight Lines, Inc., 488 F.Supp. 381, 386 (D.Minn.1980) ("If management knows or should know of incidents of racial harassment that are more than sporadic, it has a responsibility to take reasonable affirmative steps to eliminate such incidents".); Friend v. Leidinger, 446 F.Supp. 361, 383-84 (E.D.Va.1977) ("Only if the employer knows or should have known of the condition and permits it to continue without attempting to discourage it, may it be found liable."), judgment aff'd, 588 F.2d 61 (4th Cir.1978); Bell v. St. Regis Paper Co., Container Division, 425 F.Supp. 1126, 1137 (N.D.Ohio 1976) (employer may be liable for acts of harassment by employees "merely by condoning them.")
 
 
 [9]
 For reasons that are certainly inscrutable to me, the majority interprets my advertance to Acton to constitute the "novel" and "erroneous" suggestion that a student is an agent of the school in order to fit within the majority's conflation of agency and tort principles. See maj. op. at 1010, n. 9. As should be clear from the discussion of Acton in the text of my dissent, I have referred to that case merely to point out that the Supreme Court has recognized that schools maintain a degree of control over school children and that in this context such control is sufficient to apply tort liability for the knowing failure of a school receiving federal funds to act in accordance with its statutory duty to prevent sex discrimination in the school