Sheronne THORPE, Plaintiff,

v.

**VIRGINIA STATE UNIVERSITY,**
**et al., Defendants.**

**No. Civ. 3:96CV975.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 8, 1998.

508

Eileen N. Wagner, Richmond, Virginia, for plaintiff.

Debra J. Prillaman, Richmond, Virginia, D. Judith Keith, Washington, D.C., for United States.

Allison P. Landry, Margaret A. Browne, Office of the Attorney General, Richmond, Virginia, for VA State Univ.

## MEMORANDUM OPINION

PAYNE, District Judge.

Sheronne Thorpe filed this action against Virginia State University ("VSU"), seeking redress of alleged violations of the Education Amendments of 1972, Pub.L. No. 92–318, Tit. IX, § 901 86 Stat. 373 (1972) (codified as amended at 20 U.S.C. §§ 1681–1688 (1994)) ("Title IX"). The Second Amended Complaint alleges that VSU intentionally discriminated against Thorpe by failing to afford her notice of the procedure to follow after Thorpe allegedly was raped by other VSU students. The notice and procedure which lie at the core of Thorpe's discrimination claim are found in regulations published by the Department of Education pursuant to its congressional authority to implement rules and regulations consistent with the objectives of Title IX.

Pursuant to Fed.R.Civ. P. 12(b)(1), VSU has moved to dismiss the action, asserting that the Eleventh Amendment affords VSU the benefit of sovereign immunity and thereby precludes the exercise of jurisdiction by this Court over this action. Notified that the constitutionality of Title IX was at issue, the United States elected to intervene to defend the statute. Thorpe and the United States oppose dismissal because, in their view, Congress has eliminated the States' Eleventh Amendment immunity for private actions seeking damages under Title IX. For the reasons set forth below, the motion to dismiss for lack of subject matter jurisdiction is denied.

## STATEMENT OF FACTS

On December 3, 1995, Thorpe, an 18–year–old student of VSU, and another female resident in Thorpe's all-female dormitory travelled across campus to an all-male dormitory to watch a movie in response to an invitation from Jovelle Tillman, a male VSU student and an acquaintance of Thorpe's companion. When Thorpe and her friend arrived at Tillman's dormitory, the resident assistant, whose responsibilities included insuring that admission of visitors into the men's dormitory was in accord with VSU policy, told Tillman to take the females "up the back way." In fact, VSU policy prohibited female visitors in the men's dormitory at that hour.

Thorpe entered a room crowded with VSU students and began watching a movie. The room belonged to Marcus Steele, a young man whom Thorpe did not know. Steele offered Thorpe a beer, but Thorpe declined the invitation. Shortly thereafter, Rodney Granger, another VSU student, introduced himself to Thorpe. The two then struck up a conversation during which Thorpe remarked that she liked the glow-in-the-dark star pattern on the ceiling of Steele's room. Granger asked Thorpe if she would like to wait for her companion in another room where he could show her a more intricate display.

Thorpe went to the other room with Granger, and again was offered a beer which she refused. Shortly thereafter, Steele entered the room and asked "How about a threesome?" Thorpe then requested Steele to leave, and told Granger that she felt uncomfortable waiting in the room for her companion. Granger left in search of Thorpe's friend. Thorpe also left the room, apparently to find her companion, but Thorpe was unsuccessful so she returned to collect her

coat and purse with a view to returning alone to her dormitory. At that point, Granger, and then Steele, allegedly raped Thorpe in the presence of other male VSU students. After the attack, the group escorted Thorpe to the floor above where Thorpe's companion was waiting. The two females then left the men's dormitory.

Thorpe immediately reported the incident to the resident assistant in her dormitory who, in turn, notified campus police. After a police interview, Thorpe was admitted to the Southside Regional Medical Center where she received treatment and testing for rape trauma. Later that day, Thorpe filed charges of felony sexual assault against Granger and Steele. The male VSU students never denied that the sexual intercourse took place; instead, they asserted that it was consensual.[1]

On December 4, 1995, the day after the alleged sexual attacks, Thorpe met with Vice–President of Student Affairs Claud Flythe and two university psychologists.[2] Flythe called the incident a tragedy, assured Thorpe that VSU "would take care of it," and stated that the guilty parties would be punished. Excused from final examinations by Flythe, Thorpe returned to her home in New York.

According to Thorpe, at no time after she reported the rape did VSU provide her with the VSU Student Handbook, the VSU Code of Student Conduct, or a Sexual Harassment Complaint Procedure, all of which, according to Thorpe and the United States, are re-

quired to be provided by the regulations implementing Title IX. As a result of these failures by VSU, Thorpe alleges that she concluded that the student rapists "would remain at large on the VSU campus and that her personal safety would be in jeopardy if she returned to school." (Second Am. Compl. ¶ 24.)[3] Fearing for her personal safety, Thorpe did not return to VSU for the spring 1996 semester, or thereafter. Thorpe filed this action against VSU seeking declaratory relief and damages for violations of Title IX's implementing regulations.

Asserting Eleventh Amendment sovereign immunity, VSU has moved the Court to dismiss Thorpe's Title IX claim for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).[4] As explained below, VSU's motion to dismiss is not well-taken.

## DISCUSSION

### A. ELEVENTH AMENDMENT SOVEREIGN IMMUNITY

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although its text literally bespeaks a limitation only on federal diversity jurisdiction under Article III of the Constitution, *see Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court

---

1. These background facts are alleged in the original and First Amended Complaints which also asserted claims against Granger, Steele, and Tillman under the Violence Against Women Act, 42 U.S.C. § 13981. Those claims have been resolved by settlement or voluntary dismissal.

  Also, Thorpe originally asserted against VSU a hostile-environment sexual-harassment claim, arising out of VSU's alleged failure to take proper precautions to prevent Thorpe's rape by VSU athletes after having knowledge that other VSU athletes had previously sexually assaulted female students on the VSU campus. Thorpe has voluntarily dismissed that claim without prejudice.

2. The claims asserted against Flythe were dismissed with prejudice by Order entered February 25, 1998.

3. Following a one-day bench trial conducted on June 20, 1996, Granger was acquitted. After Granger's acquittal, no charges were initiated against Steele. According to the First Amended Complaint, not one of the VSU students allegedly involved in the attack on Thorpe was subjected to any form of disciplinary action by the school.

4. It is undisputed that VSU is an agent of the Commonwealth of Virginia and a creature of the Virginia General Assembly. Filing a claim for relief against VSU is thus the functional and legal equivalent of bringing an action against the Commonwealth. Accordingly, VSU enjoys Eleventh Amendment immunity to the same extent as the Commonwealth of Virginia. *See Haley v. Virginia Commonwealth Univ.*, 948 F.Supp. 573, 578 (E.D.Va.1996).

has interpreted the provisions of the Eleventh Amendment as imposing "a constitutional limitation on the federal judicial power established in Art. III," which is much broader than the text of the amendment. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *see Seminole Tribe*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *Port Auth. Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). More particularly, the Supreme Court has explained that the Eleventh Amendment stands "not so much for what it says, but for the [two-part] presupposition ... which it confirms [:] ... first, that each state is a sovereign entity in our federal system, and second, that '[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.' " *Seminole Tribe*, 517 U.S. at 54 (quotation mark omitted)(second alteration in original)(*quoting Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) and *Hans v. Louisiana*, 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890)); *see also Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993)("The [Eleventh] Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity.").

■ The immunity conferred upon the States by the Eleventh Amendment, however, is not absolute. The immunity may be foresworn if a State, by its own accord, waives its Eleventh Amendment protection and consents to adjudication of an individual's action in a federal forum. *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Taylor v. Virginia*, 951 F.Supp. 591, 593 (E.D.Va.1996). Alternatively, Congress may abrogate the States' sovereign immunity if it unequivocally expresses the intent to do so, and acts pursuant to a constitutional provision bestowing upon Congress the power to pierce the shield of immunity provided by the Eleventh Amendment. *See Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114; *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 88

L.Ed.2d 371 (1985); *Taylor*, 951 F.Supp. at 593.

It is undisputed that the Commonwealth of Virginia has not consented to suits of the sort brought by Thorpe. The issue raised by VSU's motion to dismiss for lack of subject matter jurisdiction, then, is whether Congress has abrogated the States' sovereign immunity for actions instituted under Title IX.

## B. ABROGATION OF ELEVENTH AMENDMENT IMMUNITY

To determine whether Congress successfully has abrogated the immunity guaranteed by the Eleventh Amendment, it is necessary to apply the two-part test recently refined by the Supreme Court in *Seminole Tribe*. The threshold inquiry under that test is whether Congress unequivocally expressed its intention to abrogate the States' Eleventh Amendment immunity. *See Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114. If Congress has abrogated that immunity, the second question is whether, in so doing, Congress acted pursuant to a valid exercise of constitutional power. *Id.*

### 1. Unequivocal intent to abrogate

■ Congress may abrogate the States' Eleventh Amendment immunity from private actions in a federal forum only "by making its intention unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 227–28, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *see Atascadero*, 473 U.S. at 242, 105 S.Ct. 3142; *Taylor*, 951 F.Supp. at 594. "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *Atascadero*, 473 U.S. at 246, 105 S.Ct. 3142; *see Seminole Tribe*, 517 U.S. at 55–56, 116 S.Ct. 1114.

The parties seem to agree that, as originally promulgated, Title IX did not provide for abrogation of the States' Eleventh Amendment immunity. The logical explanation for the absence of such a provision is that Title IX, by its own terms, does not expressly

create a private right of action for individuals aggrieved by State violations of the statute's substantive terms. Hence, there is no need for an abrogating provision. It is thus unsurprising that the original provisions of Title IX do not abrogate the immunity to which the States are constitutionally entitled.

In 1979, however, the Supreme Court found in Title IX an implied private right of action to redress substantive violations of its terms. *See Cannon v. University of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Although the ensuing years saw some private enforcement of Title IX through the newly created private action, none necessitated resolution of a State's liability for alleged violations of Title IX.

Then, in 1985, the Supreme Court decided that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language *in the statute itself.*" *Atascadero*, 473 U.S. at 243, 105 S.Ct. 3142 (emphasis added). The decision rather significantly curtailed the reach of several civil-rights statutes, including Title IX, by precluding enforcement of those statutes against the States by way of private actions because the statutes did not contain any provision which abrogated the States' immunity.

Shortly after the *Atascadero* decision, Congress enacted the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7, thereby amending Title IX as well as other civil-rights legislation. Section 2000d–7 provides that *"[a] State shall not be immune under the Eleventh Amendment* of the Constitution of the United States *from suit in Federal Court for a violation of . . . title IX of the Education Amendments of 1972 . . .* or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." 42 U.S.C. § 2000d–7(a)(1) (emphasis added). The Amendments also provide that *"[i]n a suit against a State,"* the remedies for violation of Title IX, and various other civil-rights legislation, *"are available . . . to the same extent as such remedies are available for a such a violation . . . against any public or private entity other than a State." Id.* § 2000d–7(a)(2)(emphasis added).[5]

■ The parties do not dispute that, in Section 2000d–7, Congress has provided an unmistakably clear statement of its intent to remove the protection of the Eleventh Amendment for private civil actions instituted under the provisions of, among other civil rights legislation,[6] Title IX. Joining the majority of courts that have addressed the is-

**5.** In *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court construed Section 2000d–7 as the *sub silentio* affirmation by Congress of the implied cause of action created judicially in *Cannon*.

**6.** Section 2000d–7 also evinces Congress' attempt to abrogate the States' Eleventh Amendment immunity for claims alleging violations of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.;* and Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.* other courts, consistent with the analysis employed in this opinion, have held that the Eleventh Amendment offers the States no protection with respect to claims initiated under the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973. *See, e.g., Clark v. California*, 123 F.3d 1267, 1270 (9th Cir.1997)(holding that Congress constitutionally abrogated Eleventh Amendment immunity for ADA and Rehabilitation Act claims), *petition for cert. filed*, 66 U.S.L.W. 3308 (U.S. October 20, 1997)(No. 97–686); *Crawford v. Indiana Dep't of Corrections*, 115 F.3d 481, 487 (7th

Cir.1997)(holding that there is no Eleventh Amendment barrier to a suit instituted under the ADA); *Parents for Quality Educ. with Integration*, 753 F.Supp. 733, 736 (N.D.Ind.1990)("In section 2000d–7 Congress specifically subjected the states to federal jurisdiction for violations of (among others) 42 U.S.C. § 2000d et seq. (title VI of the Civil Rights Act of 1964), thus waiving the states' Eleventh Amendment immunity from these claims."), *aff'd*, 977 F.2d 1207 (7th Cir. 1992), *modified on other grounds on denial of rehearing*, 986 F.2d 206 (7th Cir.1993). *But see Nihiser v. Ohio Environmental Protection Agency*, 979 F.Supp. 1168, 1176 (S.D.Oh.1997)("[C]onclud[ing] that the ADA and Rehabilitation Act accommodation provisions, at least insofar as 'accommodation' is defined in 42 U.S.C. § 12111(9)(b), are not a valid exercise of Congress' enforcement power under § 5 of the Fourteenth Amendment."); *Brown v. North Carolina Div. of Motor Vehicles*, 987 F.Supp. 451, 460 (E.D.N.C.1997)(holding that Congress does not have the authority under the Fourteenth Amendment "to effectuate the ends of the ADA" and thus ADA claims asserted against the States as sovereigns are barred by the Eleventh Amendment).

sue, the Court concludes that Section 2000d–7 reflects the unmistakably clear intention of Congress to abrogate the States' Eleventh Amendment immunity for Title IX claims, thus satisfying the first component of *Seminole Tribe*.[7]

## 2. Constitutional Authority

Thus, VSU's motion to dismiss turns on whether, in enacting Section 2000d–7, Congress acted pursuant to a valid exercise of constitutional power. That is: was Section 2000d–7 "passed pursuant to a constitutional provision granting Congress the power to abrogate?" *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114.

### a. *Seminole Tribe* Decision

In *Seminole Tribe*, the Supreme Court held that, notwithstanding Congress' " 'unmistakably clear' statement of its intent to abrogate," *Seminole Tribe*, 517 U.S. at 56, 116 S.Ct. 1114, Congress does not have the constitutional power to abrogate State immunity through legislation enacted under the Indian Commerce Clause contained in Article I. *See id.* at 72–73, 116 S.Ct. 1114. In reaching that result, the Supreme Court overruled its decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), in which a plurality of the Court held that the Interstate Commerce Clause, Art. I, § 8, cl. 3, conferred upon Congress the constitutional power to abrogate Eleventh Amendment immunity. *Id.* at 59–60, 66, 109 S.Ct. 2273.

This rather drastic judicial reversal of course was required, according to the Court, because the *Union Gas* decision was a sharp deviation from the Court's "federalism jurisprudence," which established that the Eleventh Amendment's conferral of sovereign immunity "limits the grant of judicial authority in Article III." *Seminole Tribe*, 517 U.S. at

63, 116 S.Ct. 1114 (*quoting Pennhurst*, 465 U.S. at 97–98, 104 S.Ct. 900). Because "[t]he Eleventh Amendment restricts the judicial power under Article III," the Court, in overruling *Union Gas*, held that congressional legislative authority under "*Article I* cannot be used to circumvent the constitutional limitations" that the Eleventh Amendment "place[s] upon federal jurisdiction." *Id.* at 72–73, 109 S.Ct. 2273 (emphasis added).

Although lower courts have been advised to exercise temperance in extending the reach of *Seminole Tribe, see In re Sacred Heart Hospital of Norristown v. Pennsylvania*, 133 F.3d 237, 244 (3d Cir.1998) (ROTH, J., concurring), the decision now is generally regarded as foreclosing Article I as a source of power for the congressional abrogation of the States' Eleventh Amendment immunity. *See Franks v. Kentucky Sch. for the Deaf*, No. 142 F.2d 360, 361 (6th Cir.1998); *Doe*, 138 F.3d 653, 655; *Wheeling & Lake Erie Ry. v. Public Util. Comm'n of Pa.*, 141 F.3d 88, 89 (3d Cir.1998); *In re Creative Goldsmiths of Wash., D.C. v. Maryland*, 119 F.3d 1140, 1145 (4th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998); *Crawford*, 109 F.3d at 1283. However, in *Seminole Tribe*, the Court confirmed that Congress may abrogate the States' Eleventh Amendment immunity when it acts pursuant to Section 5 of the Fourteenth Amendment. *Seminole Tribe*, at 59, 65–66, 116 S.Ct. 1114; *see Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). "Adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution," Section 5 of the Fourteenth Amendment thus "alter[ed] the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment." *Seminole Tribe*, 517 U.S. at

---

**7.** *See, e.g., Lane v. Pena*, 518 U.S. 187, 200, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (providing, in *dicta*, that § 2000d–7 reflects Congress' careful response to *Atascadero* "by crafting an unambiguous waiver of the States' Eleventh Amendment immunity"); *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 72, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)("In ... § 2000d–7, Congress abrogated the States' Eleventh Amendment immunity under Title IX ...."); *Doe v. University of*

*Illinois*, 138 F.3d 653, 655 (7th Cir.1998)("The University concedes, as it must, that Title IX and the Equalization Act [Section 2000d–7], read together, unequivocally state Congress' intent to abrogate the States' Eleventh amendment immunity...."); *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir.1997)(finding an unequivocal expression of Congress' intent to abrogate the States' Eleventh Amendment immunity in the provisions of 42 U.S.C. § 2000d–7(a)(1)).

65–66, 116 S.Ct. 1114; *see Union Gas*, 491 U.S. at 42, 109 S.Ct. 2273 (SCALIA, J., dissenting). Accordingly, Section 5 of the Fourteenth Amendment bestows upon Congress the constitutional power "to intrude upon the province of the Eleventh Amendment and therefore ... allow[s] Congress to abrogate the [States'] immunity from suit guaranteed by that Amendment." *Seminole Tribe*, 517 U.S. at 59, 116 S.Ct. 1114.

Whether Title IX and Section 2000d–7 are the spawn of a permissible power (the Fourteenth Amendment) or of an impermissible one (Article I) is the focal point of VSU's motion to dismiss this action. VSU argues that Title IX was enacted under the Spending Clause (an Article I power) and therefore neither Title IX nor Section 2000d–7, which abrogates the States' immunity as to Title IX, can be regarded under *Seminole Tribe* as having been enacted pursuant to a constitutional source which permits Congress to intrude upon the States' sovereign immunity. Thorpe and the United States, on the other hand, assert that Title IX and Section 2000d–7 were, or could have been, enacted under Section 5 of the Fourteenth Amendment and that, therefore, the abrogation of immunity in Section 2000d–7 was accomplished pursuant to a source of power which *Seminole Tribe* has held to be sufficient to authorize removal of the States' immunity.

### b. The Constitutional Source of Power for Title IX and Section 2000d–7

■ Although the Supreme Court has left open the question of "which power Congress utilized in enacting Title IX," *see Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75 n. 8, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the legislative history rather persuasively points to the conclusion that Congress enacted Title IX pursuant to its Spending Clause powers under Article I. *See Davis v. Monroe County Bd. of Ed.*, 120 F.3d 1390,

1397 (11th Cir.1997), *petition for cert. filed*, 66 U.S.L.W. 3387 (U.S. Nov. 19, 1997) (No. 97–843). A fulsome discussion of the legislative history of Title IX and its nexus to Title VI led the Court of Appeals for the Eleventh Circuit in *Davis* to conclude that, indeed, "Title IX, like Title VI, was enacted under Congress' power to spend for the general welfare of the United States." *Id.* at 1398. Other courts of appeals, likewise, have concluded that "Title IX was passed pursuant to Congress' Spending Clause Power." *Smith v. Metropolitan Sch. Dist. Perry Township*, 128 F.3d 1014, 1028 (7th Cir.1997), *petition for cert. filed*, (Mar. 16, 1998)(No. 97–1541).[8] In *Rowinsky v. Bryan Independent School District*, 80 F.3d 1006, 1012 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 165, 136 L.Ed.2d 108 (1996), the Court of Appeals for the Fifth Circuit reached the same conclusion.

As VSU correctly argues, *Davis*, *Smith*, and *Rowinsky* rather persuasively demonstrate that, in enacting Title IX, Congress acted under the Spending Clause of Article I which, under *Seminole Tribe* and its progeny, may not be the source of a congressional abrogation of the States' sovereign immunity. Drawing on this proposition, VSU contends that these decisions are dispositive of its Eleventh Amendment claim here because *Seminole Tribe* precludes resort to Article I as a basis for abrogating immunity. An essential corollary of that argument is that the abrogating text of Section 2000d–7 can be based only on Congress' Spending Clause power; a power that gave rise to the statute (Title IX) which Section 2000d–7 amended.

The principal decisions on which Thorpe and the United States rely have framed the constitutional source of power component of the *Seminole Tribe* analysis as whether Title IX was enacted pursuant to Congress' authority under Section 5 of the Fourteenth Amendment?[9] Although the legislative im-

---

**8.** In *Doe v. University of Illinois*, 138 F.3d 653, 655, the Seventh Circuit stated that *Smith* did not address an alternative constitutional basis for Title IX, such as Section 5 of the Fourteenth Amendment. *Id.* at 655. The *Doe* court then concluded that "Congress enacted Title IX and extended it to the States, at least in part, as a

valid exercise of its powers under Section 5 of the Fourteenth Amendment." *Id.* at 659.

**9.** *Compare Doe*, 138 F.3d 653, 655, 659 ("The appropriate question is, were the objectives of [Title IX] ... within Congress' power under the [Fourteenth] amendment?") (alterations in original) (internal quotation marks omitted) *with*

petus which prompted the enactment of Title IX is central to the resolution of the sovereign immunity issue, the *Doe* and *Crawford* courts, like VSU, focus only on the basis for Title IX, notwithstanding that it was in Section 2000d–7 that Congress abrogated the States' immunity for Title IX claims.

Considering the statutes here involved, it would seem that the abrogation question cannot be resolved solely by reference to Title IX. Rather, to answer *Seminole Tribe's* second query (was the abrogation accomplished "pursuant to a valid exercise of constitutional power?"), it is necessary to begin this analysis by assessing the authority upon which Section 2000d–7 was enacted. *See, e.g., Timmer v. Michigan Dep't of Commerce,* 104 F.3d 833, 838 n. 7 (6th Cir.1997); *Taylor v. Virginia,* 951 F.Supp. 591, 597 (E.D.Va.1996).

Although Congress did not identify in the statutory text the constitutional grant of power on which it purported to rely in enacting Section 2000d–7, the legislative history of that statute makes reference to the sources of power considered by Congress in enacting the statute. For example, Senator Alan Cranston, the sponsor of Section 2000d–7, observed:

> Finally, I would note my understanding that, as has been clearly established in Supreme Court cases, including the *Atascadero* case, over the past 21 years, the Congress has the authority to waive the States' 11th amendment immunity under the following provisions of the Constitution: the commerce clause, the spending clause, and *section 5 of the 14th Amendment. In my view, this legislation [Section 2000d–7] is clearly authorized by at least the latter two provisions.*

131 Cong.Rec. 22, 346 (1985) (statement of Sen. Cranston) (emphasis added). This, of

course, is only one view and an inconclusive one at that. The plain fact is that, unfortunately, neither the text of Section 2000d–7 nor its legislative history reveals the constitutional authority on which the statute is based.[10]

Moreover, Section 2000d–7 contains no substantive proscriptions at all. Nor does the statute create any substantive rights to which its remedial provisions attach. Rather, Section 2000d–7 incorporates, as its substantive predicate, each of the statutes, such as Title IX, to which the States are made amenable by virtue of a private action. This structural linkage between Title IX and Section 2000d–7 necessitates an assessment of the substantive terms and purposes of Title IX in order to ascertain the constitutional well–spring from which comes the abrogation of immunity effectuated by Section 2000d–7. Several basic principles guide the assessment required by the constitutional-source component of *Seminole Tribe,* and these principles apply with equal force to Title IX and Section 2000d–7.

First, it is axiomatic that "Congress need not expressly invoke the authority of a specific constitutional provision to act pursuant to it." *Crawford v. Davis,* 109 F.3d 1281, 1282 (8th Cir.1997). Nor are courts required to ascertain "whether Congress pointed to the right part of the Constitution when it" passed the legislation facing constitutional attack. *Oregon Short Line v. Department of Revenue Or.,* 139 F.3d 1259, 1265 (9th Cir. 1998); *see Woods v. Miller,* 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948) ("The constitutionality of action taken by Congress does not depend on recitals of power which it undertakes to exercise.").

These precepts, of course, are fully applicable in ascertaining whether Section 5 of the

---

*Crawford,* 109 F.3d at 1283 (stating that the second prong of *Seminole Tribe* "turns on whether Congress, as an objective matter, could have enacted Title IX pursuant to § 5 of the Fourteenth Amendment."). *Cf. Franks,* at 361.

**10.** Without doubt, however, the legislative history and its text demonstrate that Section 2000d–7 was a codification of Congress's decision, in response to *Atascadero,* to make the States amenable to private actions in the federal courts for alleged violations of Title IX (as well as other

civil-rights laws), including individual claims for monetary damages. *See Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 78, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (SCALIA, J., concurring in the judgment) ("The Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7(a)(2), must be read, in my view, not only 'as a validation of *Cannon's* holding,' but also as an implicit acknowledgment that damages are available.") (citation omitted).

Fourteenth Amendment is a constitutionally proper source of authority for the statutory abrogation of Eleventh Amendment immunity. In *CSX Trans., Inc. v. West Va. Bd. Pub. Works*, 138 F.3d 537 (4th Cir.1998), the Fourth Circuit pointed to the now talismanic language that "Congress need not recite the words 'section 5' or 'Fourteenth Amendment' or 'equal protection'", *Id.*, (citing *EEOC v. Wyoming*, 460 U.S. 226, 243–44 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)). The inquiry, then, is not what Congress said, or failed to say, but whether there is "some legislative purpose or factual predicate that supports the exercise of" congressional power under Section 5. *See Wyoming*, 460 U.S. at 243 n. 18, 103 S.Ct. 1054; [11] *see CSX*, 138 F.3d 537, 539. For these reasons, it is largely irrelevant whether the statute fails to identify a constitutional source, or points to the wrong source, for an abrogation of Eleventh Amendment immunity.

Second, the identification of an appropriate source of constitutional power is accomplished by an objective assessment. Hence, "[a]s long as Congress had such authority as an objective matter,whether it also had the specific intent to legislate pursuant to that authority is irrelevant." *Crawford*, 109 F.3d

at 1282; *see Franks*, at 362; *Doe*, 138 F.3d 653, 659. "However, if Congress does not explicitly identify the source of its power as the Fourteenth Amendment, there must be something about the act connecting it to recognized Fourteenth Amendment aims." *Wilson–Jones v. Caviness*, 99 F.3d 203, 209 (6th Cir.1996); *see CSX*, 138 F.3d 537, 539.[12]

Third, it must be remembered that, although a positive grant of authority, "Congress' power under § 5 ... extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment." *City of Boerne v. Flores*, —— U.S. ——, ——, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997) (alteration in original). Therefore, "[a]ny suggestion that Congress has a substantive non-remedial power under the Fourteenth amendment is not supported by our case law." *In re Creative Goldsmiths*, 119 F.3d at 1146 (quoting *Flores*, —— U.S. at ——, 117 S.Ct. at 2167). Consequently, the abrogating statute must be measured against the fundamental constitutional principle that the powers of Congress under Section 5 are remedial, not substantive. *See Flores*, —— U.S. at ——, 117 S.Ct. at 2167 (1997).

These guiding principles are manifest in the now-settled test for ascertaining whether

**11.** The footnote in *EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), is the genesis of this well-established notion. One reasonably may question the authority by which courts are permitted to affirm the constitutional validity of statutes on the basis of powers not invoked by Congress because such a rule allows wide room for judicial legislation. However, whatever may be said of the wisdom of this fundamental rule, it is too late in the day to revisit it here, nor is it within the province of this court so to do. Hence, in this case, it is necessary to determine whether Congress could have abrogated the States' immunity when it enacted Title IX, notwithstanding that Congress rather obviously did not do so.

**12.** VSU's reliance on this Court's decision in *Taylor v. Virginia* is misplaced. In *Taylor*, the Court found that no "legislative purpose or factual predicate to support [the] assertion that, in extending the [Fair Labor Standards Act ("FLSA") ] wage and overtime provisions to state ... employees, Congress acted pursuant to Section 5 of the Fourteenth Amendment." *Taylor*, 951 F.Supp. at 597. As explained, there is no connection between FLSA and the objectives of the Fourteenth Amendment. Instead, the FLSA was prompted by an economic animus, which

was consistent with a finding that Congress enacted the legislation pursuant to its Commerce Clause power in Article I. *Id.* at 600. *Taylor* distinguished the FLSA from the amendments extending coverage of the Equal Pay Act and, in relying upon the Sixth Circuit's decision in *Wilson–Jones*, *Taylor* reasoned that it is "best to regard as an enactment to enforce the Equal Protection Clause, in the absence of explicit comment by Congress, *only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection.*" *Taylor*, 951 F.Supp. at 599 (emphasis added) (citing *Wilson–Jones*, 99 F.3d at 210).

Here, unlike *Taylor*, there is both a "legislative purpose" and "factual predicate" to support a finding that Congress acted pursuant to its power under Section 5 of the Fourteenth Amendment in enacting Section 2000d–7. The text of both Title IX and Section 2000d–7, which enforces the substantive provisions of Title IX, reveals a strong connection to Fourteenth Amendment aims, and the legislative history of Section 2000d–7 clearly reflects Congress' unequivocally clear motivation to prohibit gender-based discrimination within various spheres of educational programs. The decision today is therefore entirely consistent with the decision in *Taylor*.

a statute falls within the ambit of Section 5 of the Fourteenth Amendment. That test is whether the statute:

> ■ may be regarded as an enactment to enforce the Equal Protection Clause; [2] whether it is plainly adapted to that end; and [3] whether it is not prohibited by but is consistent with the letter and spirit of the constitution.

*Wilson–Jones,* 99 F.3d at 208 (*quoting Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966)); *see M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819). The next analytical step is to determine, in light of these factors, whether Title IX qualifies as legislation that could have been enacted under Section 5 of the Fourteenth Amendment.

First, then, it must be asked: can Title IX be regarded as an enactment to enforce the Equal Protection Clause? That task need not long detain us. To begin, it is clear that the statute proscribes discrimination in education by virtue of gender:

> *No person* in the United States *shall, on the basis of sex,* be excluded from participation in, be denied the benefits of, or *be subjected to discrimination* under any education program or activity receiving Federal financial assistance....

The analysis of this factor is tempered by the principle that it is "best to 'regard as an enactment to enforce' the Equal Protection Clause, in the absence of explicit comment by Congress, only efforts to remedy discrimination against a class of persons that Fourteenth Amendment jurisprudence has already identified as deserving special protection." *Wilson–Jones,* 99 F.3d at 209; *see Taylor v. Virginia,* 951 F.Supp. at 598.[13]

As legislation designed to prevent gender discrimination in the educational setting, Title IX is appropriate legislation to enforce the equal protection guarantee of the Fourteenth Amendment. Indeed, the Supreme Court has held that the substantive provisions of the Fourteenth Amendment's Equal Protection Clause prohibit gender-based classifications by a state in the absence of an "exceedingly persuasive" justification. *See United States v. Virginia,* 518 U.S. 515, 530, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996). Legislation aimed at prohibiting race or gender discrimination falls within the ambit of Fourteenth Amendment jurisprudence which provides those classes of individuals assurance of equal protection. *See .Wilson–Jones,* 99 F.3d at 210. Indeed, the Eighth Circuit, in *Crawford,* found it difficult "to understand how" Title IX, which was "enacted specifically to combat [gender] discrimination[,] could fall outside the authority granted to Congress by § 5." *Crawford,* 109 F.3d at 1283.

Second, is Title IX "plainly adapted to enforcement of the Equal Protection Clause." As a legislative enactment whose object is to prevent federally funded educational entities from discriminating on the basis of gender, it is plain that the provisions of Title IX seek to enforce a central tenet of the Equal Protection Clause.[14]

Third, is Title IX prohibited by the "letter and spirit of the constitution" or is Title IX "consistent therewith?" This aspect of the test requires an analysis of whether the statute at issue "is consistent with the negative constraints of the Constitution, specifically the Constitution's protection of individual rights." *Wilson–Jones,* 99 F.3d at 209. No party has asserted that Title IX offends these negative restraints so this aspect of the test is not at issue here.

For the foregoing reasons, it appears that, under an objective standard, Congress could have enacted Title IX under Section 5 of the Fourteenth Amendment. Examined with the substantive provisions of Title IX in mind, it is apparent that Section 2000d–7, like Title IX itself, also may be "regarded as an enactment to enforce the Equal Protection Clause." Further, Section 2000d–7 "is plain-

---

**13.** The Third Circuit recently has criticized this limitation as too narrow. *See Wheeling,* at 90, 91. The Sixth Circuit's more limited view in *Wilson–Jones* is more consistent with the limitations set out in *Flores.* And, the Sixth Circuit's view has the salutary result of restricting judicial expansion of Section 5 of the Fourteenth Amendment.

**14.** This is not to say that all aspects of Title IX satisfy the second component of *Seminole Tribe.* Nor does it mean that the regulations at issue measure up to the means-end fit that is required of proper Fourteenth Amendment legislation. *See, e.g., Wilson–Jones,* 99 F.3d at 210. Neither issue, however, is presented here.

ly adapted to that end" by making the States, which after all, control much, if not most, of the higher educational opportunities in the country, amenable to suit in federal court for the redress of alleged claims of gender discrimination by state entities.

Citing the Supreme Court's admonition in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 16, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), VSU asserts that the Court "should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." [15] This argument, however, misapprehends the significance of the *Pennhurst* decision as to the issue presently confronting the Court. In *Pennhurst,* the Supreme Court was asked to construe a statute, not to adjudicate Congress' authority to legislate which, of course, is the issue here. *See Wyoming,* 460 U.S. at 244 n. 18, 103 S.Ct. 1054; *Doe,* 138 F.3d 653, 655 (*citing EEOC v. Elrod,* 674 F.2d 601, 608 n. 8 (7th Cir. 1982)).[16] *Pennhurst,* therefore, does not help VSU here.

### CONCLUSION

For the foregoing reasons, the Eleventh Amendment does not immunize VSU from Thorpe's Title IX claim. Hence, VSU's motion to dismiss for lack of subject matter jurisdiction is DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**15.** Many of the other arguments raised by VSU in support of its Rule 12(b)(1) objection concern whether the regulations implementing Title IX exceed the prohibition against gender discrimination contained in the latter. Those arguments go to whether there is a valid claim within the meaning of Fed.R.Civ.P. 12(b)(b) or whether, as a matter of law, Thorpe's claim can survive a motion for summary judgment under Fed. R.Civ.P. 56. Federal courts, as tribunals of limited jurisdiction, are prohibited from passing on the merits of a claim unless and until the court is satisfied that it has subject matter jurisdiction over the action. Accordingly, the Court, in this decision, determines only that there is subject

matter jurisdiction over Title IX claims. Whether the claim is meritorious is reserved for another day.

**16.** As the Seventh Circuit observed, "the question in *Pennhurst* was whether Congress intended a particular result, regardless of the constitutional grant of power under which it acted. In the present inquiry, by contrast, the intended result (of subjecting States to suit for violations of Title IX's substantive provisions) is clear, and the grant of power under which Congress acted is at issue." *Doe,* 138 F.3d 653, 655; *see Timmer,* 104 F.3d at 840.